NO. 4-96-0291

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

COMMERCE BANK, Special Administrator ) Appeal from

of the Estate of Louise Osborn, ) Circuit Court of

Deceased, ) McLean County

Plaintiff-Appellant, ) No. 94L244

v. )

MATTHEW AUGSBURGER and SARAH )

AUGSBURGER, a/k/a CHRIS AUGSBURGER, )

Defendants-Appellees, )

and )

YOUTH SERVICES OF MID-ILLINOIS, INC., )

JAMES SMITH, WILLIAM ROBERTS, JACK )

GIBSON, KIM WILLIAMSON, RYAN MCNEAL, )

PHIL RODGERS, MARI ROBERTS, RONALD )

WEBBER, WILLIAM SHERMAN, MARTHA )

CARLTON, ERIC HARDISON, SUSAN BELLAS, )

LAURA FRANZ, ANDREA TAUBER, BARBARA ) 

SCHNEIDER, JOY DULING, MARTIN ) Honorable

STREMLAU and BETH DONAHUE, ) William T. Caisley,

Defendants. ) Judge Presiding.

JUSTICE GREEN delivered the opinion of the court:

This appeal concerns the portion of a suit brought on behalf of the estate of a minor that seeks recovery in tort for negligence against the foster parents of the deceased minor.  The foster parents allegedly had custody of the minor by virtue of a placement by Youth Services of Mid-Illinois, Inc. (Youth Services), pursuant to a contract it had with the Illinois Department of Children and Family Services (DCFS) concerning dependent and neglected children.  We hold that the suit against the foster parents was not barred by sovereign immunity but was barred by parental immunity because the negligence charge concerned the foster parents' supervision and discipline of the child.

The suit began on August 21, 1995, when plaintiff, then known as The Peoples Bank but now known as Commerce Bank, acting as administrator of the estate of Louise Osborn, a deceased minor child, brought suit in the circuit court of McLean County against defendants, Matthew Augsburger, Sarah Augsburger, Youth Services, and others not party to this appeal,
 seeking recovery for injuries to and the death of the deceased minor child.  Counts I and II of a second-amended complaint were directed against the Augsburgers.  On March 25, 1996, the circuit court allowed the Augsburgers' motion to dismiss those counts in bar of action and subsequently entered an order under Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)) making that order appealable.  Plaintiff has appealed.  We affirm.

The second-amended complaint made various allegations applicable to all counts and then, in the various counts, more specific allegations were made.  As to counts I and II, the complaint stated:  (1) DCFS entered into a contract with Youth Services whereby the latter would obtain foster homes for children in the custody of DCFS; (2) pursuant to that contract, plaintiff's decedent, a three-year-old child and a DCFS ward, was placed with the Augsburgers by Youth Services; (3) the child died in the Augsburgers' home from asphyxiation and hyperthermia when the Augsburgers confined her in an enclosed space described as the "upper half of a divided shelf of a wooden cabinet inside a bedroom closet at [their] home with the door closed"; (4) the Augsburgers placed the child in the confined area; and (5) the Augsburgers "negligently, carelessly, and improperly 
supervised
" the child's activities and failed to "monitor" the child's activities "by providing no direct supervision."  (Emphasis added.)  Plaintiff sought recovery for wrongful death (740 ILCS 180/1 (West 1994)) under count I and injuries during her lifetime pursuant to the Survival Act (755 ILCS 5/27-6 (West 1994)) under count II.

The Augsburgers' motion to dismiss was made under section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 1994)), setting forth the affirmative defense that as foster parents the Augsburgers had parental immunity.  The circuit court agreed.  For the first time, on appeal, the Augsburgers contend the dismissal of counts I and II is supportable because they were agents of the state and, thus, clothed with governmental immunity.  Such a late contention is permissible because governmental immunity is treated as depriving the circuit court of jurisdiction under the terms of section 8(d) of the Court of Claims Act (705 ILCS 505/8(d) (West 1994)).  See 
Robb v. Sutton
, 147 Ill. App. 3d 710, 498 N.E.2d 267 (1986).  Lack of subject-matter jurisdiction is an issue that can be raised at any time.  
Currie v. Leo
, 148 Ill. 2d 151, 157, 592 N.E.2d 977, 979 (1992).

In any event, we conclude that the Augsburgers did not have governmental immunity.  The case they rely most heavily upon is 
Griffen v. Fluellen
, 283 Ill. App. 3d 1078, 670 N.E.2d 845 (1996).  There, the appellate court affirmed the dismissal of a suit on governmental immunity grounds brought, as here, on behalf of a foster child for alleged tort of the foster mother.  There, the foster mother had been hired directly by DCFS and was paid by that governmental entity.  Here, the alleged contract between DCFS and Youth Services described Youth Services as an independent contractor, and the agreement between Youth Services and the Augsburgers described the Augsburgers as independent contractors.  No case has been called to our attention in which a party so attenuated from the state, as the Augsburgers were here, has been held to have governmental immunity.

In 
Illinois Nurses Ass'n v. Illinois State Labor Relations Board
, 196 Ill. App. 3d 576, 554 N.E.2d 404 (1990), the Department of Corrections (DOC) contracted with a private corporation, described in the contract as an independent contractor, to provide health-care services to DOC facilities.  The private corporation was determined to be a state agent for the purpose of determining whether it was subject to the Public Labor Relations Act (Ill. Rev. Stat. 1985, ch. 48, par. 1603(o)).  The 
Illinois Nurses Ass'n
 court noted that the contract gave DOC authority to approve the nurses the corporation sent to the facilities and the power to discharge those nurses.  
Illinois Nurses Ass'n
, 196 Ill. App. 3d at 579, 554 N.E.2d at 406.  Here, no provision in the contract between DCFS and Youth Services gives similar authority to DCFS in regard to the foster parents.

The relationship between the state and the Augsburgers, who had contracted with Youth Services, which had contracted with the state, is too remote to give the Augsburgers governmental immunity.  This is particularly true where the state had so little control over the Augsburgers.  The doctrine of sovereign immunity did not justify the dismissal of counts I and II.

Accordingly, we turn to the more complicated and difficult decision as to whether the Augsburgers had parental immunity because, as foster parents of the deceased child, they stood 
in
 
loco
 
parentis
 to the child.  This brings into play the dual questions of the extent of parental immunity even in regard to natural parents and whether that immunity exists as to foster parents of the type here, where the children were state wards and had been placed, for what could be a short time, with foster parents being paid for the care of the children.

The binding Illinois case on the subject of parental immunity is the comparatively recent case of 
Cates v. Cates
, 156 Ill. 2d 76, 619 N.E.2d 715 (1993).  There, a suit was brought on behalf of a daughter against her father for injuries she received in a collision while riding as a passenger in a motor vehicle driven by him.  Negligence was charged and the father claimed parental immunity.  The circuit court granted the father's motion to dismiss on parental immunity grounds, the appellate court affirmed, but the supreme court reversed.  That court held that no parental immunity existed when the duty to drive carefully was owed by the father, not merely to the daughter, but to the public generally.  Thus, the 
Cates
 court concluded that the negligence of the father did not involve the supervision or discipline of the child and did not bring into play the doctrine of parental immunity.  
Cates
, 156 Ill. 2d at 106, 619 N.E.2d at 729.  The 
Cates
 opinion discussed in detail the parental immunity rule.  It explained that the doctrine did not exist in the English common law but arose from 
Hewellette v. George
, 68 Miss. 703, 9 So. 885 (1891), 
McKelvey v. McKelvey
, 111 Tenn. 388, 77 S.W. 664 (1903), and 
Roller v. Roller
, 37 Wash. 242, 79 P. 788 (1905).  The 
Cates
 opinion further explained:

"Illinois courts have relied consistently on three major public policy considerations for the parent-child tort immunity doctrine:  (1) 
the preservation of family harmony
, (2) the 
discouragement of fraud and collusion
, and (3) 
the preservation of parental authority and discipline
.  (See Ross, 
The Parental Tort Immunity Doctrine Applied to Wrongful Death Actions:  A Rule Without Reason
.  
Chamness v. Fairtrace
, 158 Ill. App. 3d 325, 511 N.E.2d 839 (5th Dist. 1987), 13 So. Ill. U. L.J. 175, 177-78 (1988).)  Illinois courts have more consistently espoused the preservation of family harmony rationale.  See McArdle, 
Stallman v. Youngquist:  Parent-Child Tort Immunity:  Will Illinois Ever Give This Doctrine the Examination and Analysis it Deserves?
, 19 J. Marshall L. Rev. 807, 814-15 (1986); 
Nudd
[
 v. Matsoukas
], 7 Ill. 2d [608,] 
619[, 131 N.E.2d 525, 531 (1956)] ('only' policy which might justify doctrine in area of negligence is 'reluctance to create litigation and strife between members of the family unit'); 
Illinois National Bank & Trust Co.
[
v. Turner
]
 (1980), 83 Ill. App. 3d 234, 238[, 403 N.E.2d 1256, 1260] (doctrine should not be abolished 
in
 
toto
 because of contemporary need for family harmony); 
Wilkosz v. Wilkosz
 (1984), 124 Ill. App. 3d 904, 909[, 464 N.E.2d 1232, 1236] (same); see also 
Gerrity v. Beatty
 (1978), 71 Ill. 2d 47, 49[, 373 N.E.2d 1323, 1324].

Yet, Illinois courts have narrowed the doctrine, by creating exceptions to it, where the doctrine's public policy purposes do not appear to be served.  In 
Nudd
, this court 'modif[ied]' the immunity doctrine by recognizing an exception in an automobile accident case where willful and wanton misconduct was alleged.  (
Nudd
, 7 Ill. 2d at 619[, 131 N.E.2d at 531].)  
Nudd
 implicitly viewed the defendant father's conduct, speeding on wet pavement and running a red light, as beyond 'the scope of the parental relationship.' (
Nudd
, 7 Ill. 2d at 619[, 131 N.E.2d at 531].)  
Nudd
 considered that the 'only' policy justifying parental immunity, a reluctance to create litigation and family strife, was not served by upholding
 the immunity where the conduct was of that nature. (
Nudd
, 7 Ill. 2d at 619[, 131 N.E.2d at 531].)  
Nudd
 reasoned that barring a suit for conduct which was not parental in nature did not foster family harmony, but only deprived the child of redress for his injuries.  
Nudd
 accordingly allowed intrafamily litigation.  Following 
Nudd
, however, the parent-child tort immunity doctrine remained as a bar to negligence actions.

Illinois courts, however, have carved out additional exceptions to the immunity in the area of negligence.  An exception to the immunity rule is now recognized where a child sues a deceased parent.  (
Johnson v. Myers
 (1972), 2 Ill. App. 3d 844[, 846, 277 N.E.2d 778, 779] (when the family relationship is dissolved by death, the policy basis for the immunity doctrine ceases to exist as well); but see 
Marsh v. McNeill
 (1985), 136 Ill. App. 3d 616, 622[, 483 N.E.2d 595, 599] (parent-child tort immunity barred wrongful death action by representative of deceased parents' estates against living daughter tortfeasor); see also 
Edgington v. Edgington
 (1990), 193 Ill. App. 3d 104[, 549 N.E.2d 942].)  Another exception allows children to sue grandparents.  
Gulledge v. Gulledge
 (1977), 51 Ill. App. 3d 972[, 367 N.E.2d 429] (rationale  behind immunity loses persuasive force when family relations more distant than parent-child are involved); see also 
Busillo v. Hetzel
 (1978), 58 Ill. App. 3d 682[, 374 N.E.2d 1090]."  
(Emphasis added.)  
Cates
, 156 Ill. 2d at 92-93, 619 N.E.2d at 723.

The 
Cates
 majority opinion considered other inroads upon the parental immunity doctrine and concluded that the "preservation of family harmony" and the discouragement of fraud and collusion considerations for the doctrine were no longer viable, but the preservation of authority and discipline aspects of the doctrine made sense and should be preserved.  The 
Cates
 court indicated that guidance can be gained from the opinion of this court in 
Schenk v. Schenk
, 100 Ill. App. 2d 199, 241 N.E.2d 12 (1968), and even more from 
Goller v. White
, 20 Wis. 2d 402, 122 N.W.2d 193 (1963).  
Cates
, 156 Ill. 2d at 103-04, 619 N.E.2d at 728.

In 
Schenk
, a father was permitted to bring an action against his 17-year-old daughter for negligently driving an automobile in such a way that the vehicle hit and injured him.  This court concluded that the suit would not necessarily severely injure the family harmony and should be allowed.  However, this court also concluded that the family immunity rules should not be disregarded in respect to:

"[the] conduct of either parent or child arising out of the family relationship and directly connected with the family purposes and objectives in those cases where it may be said that the carelessness, inadvertence or negligence is but the product of the hazards incident to inter-family living and common to every family."  
Schenk
, 100 Ill. App. 2d at 

206, 241 N.E.2d at 15.

In 
Goller
, a foster son brought suit against his foster father for injuries he received while riding on the drawbar of a tractor that was going from one field to another, both of which were farmed by the foster father.  Negligence was charged.  The Supreme Court of Wisconsin ultimately held that the foster father did not have parental immunity because that immunity only existed "where the alleged negligent act involves an exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care."  
Goller
, 20 Wis. 2d at 413, 122 N.W.2d at 198.  The 
Cates
 opinion described the 
Goller
 decision in these words:

"Under the 
Goll[
e]
r
 standard, a child may sue his parent for negligent conduct except where the conduct involves 'an exercise of parental authority *** [or] an exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care.'  [Citation.]  The first limitation embraces the area of parental discipline; and the second has been interpreted as concerning only the performance of legal duties and not moral duties, such as a duty to supervise.  (
Thoreson v. Milwaukee & Suburban Transport Co.
 (1972), 56 Wis. 2d 231, 246-47, 201 N.W.2d 745, 753.)  Arguably, under the 
Goll[e]r
 standard, a child could not sue his parent for a failure to maintain the family residence in some manner (for instance, a failure to secure carpeting)."  
Cates
, 156 Ill. 2d at 90-91, 619 N.E.2d at 722.

While upholding the right of the daughter to sue her father for negligent driving, the 
Cates
 court emphasized that parental immunity still existed in a less structured area than 
Goller
 would suggest to offer "protection to conduct inherent to the parent-child relationship" (
Cates
, 156 Ill. 2d at 104, 619 N.E.2d at 729) and further stated:

"The standard we have thus developed focuses primarily on conduct inherent to the parent-child relationship, which conduct we describe by approximating the 
Goll[e]r
 standard without its enumerated duties.  Such a standard is consistent with other jurisdictions which have abrogated the immunity in order to achieve greater clarity in the area of parent-child negligence.  The standard we have created is not, however, as extreme because we do not fully abrogate the immunity, but rely on an exception.  Our standard also allows a broader area of negligent conduct to remain immunized.  Thus, under our standard, parental discretion in the provision of care includes maintenance of the family home, medical treatment, and 
supervision of the child
.  A child may attempt to sue a parent alleging that the child fell on a wet, freshly mopped floor in the home, but the immunity would bar such an action because the parent was exercising his discretion in providing and maintaining housing for the child."  (Emphasis added.)  
Cates
, 156 Ill. 2d at 105, 619 N.E.2d at 729.

The conduct with which the Augsburgers are charged is severe, but plaintiff did not see fit to allege that conduct was willful and wanton.
  If it was willful and wanton, parental immunity would not be a defense.  
Cates
, 156 Ill. 2d at 83, 619 N.E.2d at 718; 
Nudd
, 7 Ill. 2d at 619, 131 N.E.2d at 
531.  The second-amended complaint describes the Augsburgers' conduct as a failure to supervise and monitor the child and the negligent placement of the child in a closet.  This is the very type of conduct for which the 
Cates
 opinion would still provide for the defense of parental immunity.  Clearly, if the Augsburgers were the natural parents of the deceased child, parental immunity would be an affirmative defense to counts I and II of the second-amended complaint.

We finally come to the question of whether foster parents of the type the Augsburgers were are entitled to parental immunity.  No Illinois decision is directly on point.  In 
Rourk v. State
, 170 Ariz. 6, 821 P.2d 273 (1991), 
Mayberry v. Pryor
, 422 Mich. 579, 374 N.W.2d 683 (1985), and 
Andrews v. County of Otsego
, 112 Misc. 2d 37, 446 N.Y.S.2d 169 (1982), similar types of foster parents have been denied parental immunity for torts upon foster children.  On the other hand, in 
Brown v. Phillips
, 178 Ga. App. 316, 342 S.E.2d 786 (1986), and 
Mitchell v. Davis
, 598 So. 2d 801 (Ala. 1992), parental immunity has been granted such types of foster parents.

In 
Goller
, the foster father had custody of the injured minor under circumstances similar to those here.  A specially concurring justice would have decided the case on the basis that the foster father could have no parental immunity because foster parents do not have such an immunity.  The majority impliedly rejected that theory because they spoke of the foster father as being a father, as did the 
Cates
 opinion (
Cates
, 156 Ill. 2d at 

90, 619 N.E.2d at 722).  Had the 
Goller
 majority deemed that foster parents could not have parental immunity, it would have been unlikely to struggle with the question of whether the particular circumstances of the child's injuries triggered the doctrine of parental immunity.  Had the 
Cates
 majority not thought that the father in 
Goller
 would, under the circumstances, have had parental immunity, the 
Cates
 court would have been unable to tie into 
Goller
 as a significant case in regard to parental immunity.

Unquestionably, foster parents under the circumstances of the Augsburgers have responsibility in regard to the supervision and discipline of those children under their care.  Negligence in that regard is what is charged here.  Foster parents are nearly as much in need of leeway in this regard as are natural parents.  Often animosity can exist between natural parents and foster parents.  Exposure to suit for negligence in supervising and disciplining the children in their custody would be a deterrent to the best performance by the foster parents in this regard.  We find no precedent for denying parental immunity here and deem the granting of it consistent with the theory of 
Cates
.

Plaintiff maintains that the fact that the injured child is now deceased is an appropriate reason for denying immunity.  That logic would be most appropriate if the purpose of immunity was to preserve family harmony or to avoid collusion.  However, those factors are no longer grounds for imposing immunity.  The subsequent death of the child does not bear upon the freedom the natural parent or foster parent needs to deal with the child in his or her lifetime.

As we conclude that the Augsburgers were clothed under parental immunity from suit for negligence in regard to their supervision and discipline of the deceased minor, we affirm the judgment of the circuit court dismissing counts I and II of the second amended complaint.

Affirmed.

KNECHT, J., concurs.

COOK, J., dissents.

JUSTICE COOK, dissenting:

I respectfully dissent and would reverse and remand the decision of the trial court.

The doctrine of parental immunity has been significant­ly narrowed in recent years.  The majority decision runs contrary to that trend by applying the doctrine, for the first time, to foster parents.  See W. Keeton, Prosser & Keeton on Torts §122, at 905 n.43 (5th ed. 1984). 

The majority concludes the foster parents here should be granted immunity because of the policy consideration favoring "'the preservation of parental authority and discipline.'"  Slip op. at 6, quoting 
Cates
, 156 Ill. 2d at 92, 619 N.E.2d at 723.  In my view, there is a significant difference between (many) foster parents on the one hand, and natural parents, adoptive parents, and stepparents on the other.  As I argued in my dissent when this case first came before this court, that difference is permanency of relationship.  
Country Mutual Insur­ance Co. v. Peoples Bank
, 286 Ill. App. 3d 356, 362-66, 675 N.E.2d 1031, 1035-37 (1997) (Cook, J., dissenting).   A foster parent is often only "a tempo­rary way station on the road of a child's life until the diffi­culties at home can be straight­ened out."  
Johnson v. Burnett
, 182 Ill. App. 3d 574, 582, 538 N.E.2d 892, 897 (1989).  

To some extent children are stuck with their natural parents, and perhaps it is best to bar some tort actions in the interest of the "preservation of parental authority and disci­pline."  Children are not stuck with their foster parents, however.  If problems arise, new foster parents may be appoint­ed.  If Louise had survived this incident, would we really expect her to be returned to the care of the Augsburgers?  The Augsburgers also had temporary custody of Louise's brother, Sean, and that custody was terminated immediately after the incident.  Preserva­tion of parental authority and discipline is not a realistic concern in this case.  

Perhaps the majority's concern is not with the particu­lar parent-child relationship in this case, but with the effect of this case on future relationships.  Will there be a "chilling effect" on future foster parents who attempt to disci­pline children placed in their care?  The fact of the matter is that foster parents do not decide for themselves how parental authori­ty should be exercised or discipline imposed.  The disci­pline of foster chil­dren is already closely regu­lat­ed by the DCFS.  See 89 Ill. Adm. Code §402.21 (1996) ("Disci­pline of Chil­dren").

     The majority indicates that "the discouragement of fraud and collusion" (slip op. at 9) is no longer recognized as a valid reason for a parental immunity rule.  See slip op. at 14-15.  To the extent that reason has any lingering validity, I would note there is no possibility of fraud or collusion in this case.  Unlike natural parents, adoptive parents, or stepparents, there is no way that foster parents will receive any pecuniary benefit in a case like this.  Louise was a ward of the court, and her finan­cial affairs are under the control of the court, not the Augsburgers.  

The majority finds it significant that plaintiff did not allege willful and wanton misconduct, where parental immunity would not be a defense.  Slip op. at 12.  There may be reasons why plaintiff did not allege the conduct was willful and wanton.  Plaintiff has also filed an action regarding this incident in the Court of Claims against DCFS (95 Ill. Ct. Cl. 3757) and may be concerned that an allega­tion of willful and wanton miscon­duct in this case would hinder the prosecution of that case.  

I agree with the majority that this action is not barred by sovereign immunity.